All right, let's pick up the next case, Air Products & Chemicals Co. v. ICC. And let me say this, all of you responsible for dividing up your time, keep track of it yourself. If you want to divide up, that's fine with us. Please proceed, Counselor. Thank you. Thank you, Your Honor. May it please the Court, my name is Eric Robertson. I'm with the law firm of Leaders, Robertson & Tonson in Granite City, Illinois. And I represent the petitioner appellants in this case, who are 12 large electric users of Amron, Illinois. That's why they take delivery service from Amron, Illinois. And they were participants in the case below at the Illinois Commerce Commission, and participated in that case as the Illinois Industrial Energy Consumers. These customers are members of the DS4 delivery service rate class, which consists of the primary voltage, high voltage, and 100 kV subclasses. They challenged the Commission's order first on the Commission's approval of Amron's misallocation of single-phase primary distribution costs, which represent about 54% of Amron's entire primary distribution system, or $1.3 billion, in part to primary voltage customers, which include IIEC members. When the record shows that the facilities in question are used exclusively, or almost exclusively, by secondary voltage customers of Amron. And also they challenged the Commission's refusal to approve investigatory or workshop processes to consider the merit and details of segregating the primary distribution costs into single-phase and three-phase components, and allocating 10 to 20% of the single-phase costs to secondary voltage customers in the interim. Second, they challenged the Commission's decision to approve a rate moderation plan for electric distribution tax that imposes increases as large as 91 to 117% on certain DS4 customer groups because the rate moderation plan did not create rate shock while approving a rate mitigation limiter plan for other DS4 customers to protect them from increases of 50 to 100% to prevent rate shock. Now, the first issue I'd like to talk with you about is the allocation of the single-phase primary distribution plan. The undisputed evidence in this case establishes that 54% or $1.3 billion of the cost of Amron's primary distribution is associated with single-phase service. No party challenged IIEC's estimate, which is based on information IIEC received from Amron in discovery. The $1.3 billion estimate represents the cost of single-phase elements of the Amron primary distribution system. The single-phase portion of the primary distribution system is used exclusively or almost exclusively by secondary voltage customers, but single-phase facility costs are allocated in part to primary voltage customers, as I indicated previously. The Commission has the duty to establish just and reasonable rates under the Public Utilities Act, Sections 9-101 and 1-102. Section 9-101 requires the Commission to establish rates and charges for the public utility that are just and reasonable, and that unjust and unreasonable charges for such services are prohibited and declared unlawful. Section 1-102 expresses the Legislature's intent that the variation in cost by customer class and time of use be taken into consideration in authorizing rates for each class, and that rates accurately reflect the cost of delivering utility services to customers, and that the cost of supplying those services be allocated to those who cause the cost to be incurred. Consistent with these primary and overarching statutory principles, other provisions of the Public Utilities Act provide that charges, terms, and conditions for such things as delivery service be just and reasonable and cost-based. That's Section 16-108C and D. Clearly, the Commission, not utility customers, has the obligation to set or establish the just and reasonable rates. Rates cannot be just and reasonable where, as here, customers are required to pay for utility plant and service they do not use. The rates fail to consider the significant differences in cost responsibility. In this case, IIC proposed to correct the misallocation of single-phase primary costs to customers who do not use those single-phase facilities. IIC proposed the Commission initiate an investigation workshop process to review the segregation of single-phase and three-phase components of the primary distribution system to help refine saying, and in the interim, to consider only 10 to 20 percent of the primary voltage system as single-phase and be allocated exclusively to secondary customers in recognition of such customers' exclusive use of such facilities. The Commission rejected IIC's proposal for an investigation workshop, knowing the complexities of the primary distribution system and the fact that it is constantly changing, concluding that it did not believe it was appropriate to expend resources to undertake workshops or investigations of this issue, consistent with its decision in a recent Commonwealth Edison case in Commission Docket 130387. Counsel, is it standard practice in the industry to segment primary service by phase? It depends on the utility, Your Honor. I think we put in some information in our brief indicating that Wisconsin has considered and believes that such approaches may be appropriate. The National Association of Regulatory Commissioners rate-making manual does recommend that loads responsible for costs be assigned those costs and do reference secondary and primary splits and secondary three-phase and single-phase splits. So I would say yes. That would have been a short answer for your question. Well, in reading the REACT decision that came out here while this case was pending, that court had a similar question put to it, but you believe even in looking at that decision that it would be standard practice? Yeah, I can only – no, I didn't say standard practice, Your Honor. I said it varies from utility to utility, but it is done. Okay. I don't know that – I couldn't tell you that it's uniformly done throughout the country by every utility. Is it in this record of what the potential costs might be of a workshop or a study? No, that's – You never got that far, did you? Well, that's one of the things we challenged the Commission's order on. They don't identify – nobody testified as to what it would cost or what resources would have to be used. The Commission just drew that conclusion out of thin air. So the answer to your question is no, there's no evidence in the record to show what it is, and that's one of the problems we have with the Commission's decision here. As I was about to say, the order in this case appears to be based on the Commission's decision in the combat case, and in this case, as I indicated, AMR presented no evidence and took no position in its testimony in opposition to the investigation of the workshop, stressing that it was neutral on this aspect, which is why there's no evidence in the record to show what it would cost or what the complexities of it might be. AMR testified that its workshops and investigations would be separate from combat because combat was different, and it had different information technology systems and different data available for analysis. So AMR is not the same as combat, and the Commission failed to recognize or consider that fact in reaching its decision. In this case, no AMR witness testified the primary distribution system was so complex that such a workshop or investigation could not be accomplished. In fact, AMR witnesses testified that such an investigation could provide useful information. Here, no AMR witness testified. We already covered that about the resources in your question. I'll go to the next point. In this case, staff who was opposed to the proposal in the combat case and who presented testimony in opposition took no position on the workshop here and no position on the allocation of the 10 to 20 percent. So there was nothing from the staff to demonstrate why the workshop shouldn't be held or why the allocation we were proposing shouldn't be made. The Commission, having based its decision apparently on what happened in combat, is not permitted under the law, as we understand it, to base its decision on findings and evidence in another case, and that's based on the Loudon case, which we cite in our testimony. It must base the decision on the record, in this case, under Section 10-103 of the Public Utilities Act. None of the Commission's reasoning on this issue justified, based on the record, the action that it took in refusing our proposal to have a workshop on an investigation of this issue. Now, the interesting part is that the Commission appears to take the position, without any detailed evidentiary support, that it's concerned about the complexity and difficulty of conducting the kind of study and investigation that we would have liked to have, but complexity or difficulty in performing studies necessary to ensure that rates are just and reasonable does not, in and of itself, allow the Commission to avoid its statutory duty to set just and reasonable rates by determining the appropriate cost allocations for single-phase primary facilities, based on the evidence in the record here. We cite as an example of a court that actually concluded that that was the case the Illinois Commerce Commission versus Federal Energy Regulatory Commission case, which is a Seventh Circuit Court of Appeals case identified in our brief. There, the Illinois Commerce Commission, together with other states and commissions, challenged a FERC order in which the FERC had concluded that it was not going to use its traditional allocation methodology, allocating transmission costs on the basis of benefits received, because it was too difficult under that circumstance to do that. And that involved allocation of transmission costs across multi-states among multi-utilities. The Commission challenged that decision, and the appellate court agreed that it was not sufficient for the Commission to avoid its statutory duty to set just and reasonable rates by simply saying, without any detailed support, it's too difficult. So the Commission properly appealed and the Seventh Circuit properly reversed the Federal Energy Regulatory Commission in that instance, who operates under a statute that is similar, though not exactly the same, as the Public Utilities Act in Illinois. Now, we've argued about the 10% or 20% in our brief, so I'm not going to go through that other than to say that, given the circumstances here that 54% of this system is used exclusively by secondary voltage customers, we think it's pretty much a no-brainer to allocate at least 10% to 20% of those distribution costs exclusively to the customers who are exclusively served by them, pending the results of the investigation that we've recommended be initiated. Now, we also have a rate moderation plan for electric distribution tax, and to make a long story short here, the problem that we have with what the Commission did is not only did they reject our plan for rate moderation for phasing in the distribution tax, which, by the way, was supported by the Illinois Commerce Commission staff, so it wasn't just a matter of the big customers trying to take advantage. The Commission staff supported our position in favor of an alternative position that was proposed by Ameren in the context of the case, and the proposal was made in the servo-buttle portion of the case, and there was no opportunity for anybody to present any evidence in response to that last Ameren proposal, but one of the parties did, during cross-examination, put in an exhibit which purported to show what the increases would be for this phase-in, and it showed that for the larger customers in our group, the increases would be 91 to 117 percent. Now, the Commission, what it boiled down to was eventually the Commission said, well, we think the phase-in is all right because it's going to phase in these costs over a shorter period of time, and we think that's important, and it won't cause rate shock. The Commission measures rate shock by the percentage increase that is being proposed or will be resulting from the particular utility proposal. So traditionally, the Commission has found that, seldom found, that rate increases of 100 percent don't cause rate shock. They have approved rate increases or phase-in of rate increases as small as 39.9 percent and 14.8 percent over time because they thought they would cause rate shock. The other thing that's important to keep in mind in this case is in the same case, for customers in the same DS4 class, rain-drying customers, the Commission approved an extension of what they call the rate limiter, rate moderation approach, rate mitigation approach, because, or at least in part because, these customers would face an increase of 50 to 100 percent without the extension of the rate limiter or rate moderation. So we have a situation here where the Commission has taken customers from the same rate class and the DS4 rate class and said, for this group of customers, 50 to 100 percent increase is rate shock. And these are grain dryers using three-phase service? Yeah, the phase of service in this particular, I asked if this issue is not important, Your Honor. It's what subclass you are in. But the reason I ask, they're big users. Yes, yes. I was trying to figure out, are they farmers, are they grain elevators, but they're big users. They're big grain elevators where farmers take the grain they have to dry off. I think probably Archer Daniels Middleton is one of my clients, and I have no doubt that. Well, they're passing that on to the farmer anyhow because he's getting done on the amount of moisture, isn't he? So the grain elevator is not really paying it, it's the farmer. Yeah, and the problem here, Your Honor, is not, one, that they are in the same rate class that we are. Number two, that the Commission found, at least in part, that they should get the rate extension or rate limiter because otherwise they faced increases of 50 to 100 percent. At the same time, taking customers in the same rate class, my class, and saying, no, we think an increase of 91 to 117 percent doesn't cause rate shock for you, so you don't need to have that any further moderated. And so we ask that the Commission reverse the, I'm sorry, not the Commission, we ask that you reverse the Commission's order on these two issues for the reasons that we stated in our 4K3 and our reply brief. Counsel, it looks like no questions and you'll get a chance for rebuttal. Thank you. So arguments for the affilee, first of all, who's going to go first? The Chair wants to go first. All right. Good morning, and may it please the Court. My name is Eric Dermott. I'm Corporate Counsel for Ameren Services Company, representing Ameren, Illinois, in this matter. As Mr. Robertson discussed, and I'm sure you know, this case involves an appeal from an Illinois Commerce Commission order. The underlying case was initiated because every three years, Ameren, Illinois is required by statute to file a case to examine how to design rates. So this has nothing to do with the amount of money that we collect from customers, but rather the most fair way to collect that money. The case being appealed was initiated in the summer of 2013, meaning, and I think this is important to note, that AIC will file yet another case in just a few short months. There are two primary issues before you on appeal, the rate mitigation plan involving the allocation of electric distribution taxes. Mr. Stanton, on behalf of the ICC, is going to discuss that issue with you. And I'm going to focus on the issue involving the allocation of primary distribution lines. That issue presents really two sub-issues here. Whether the ICC should have allocated some portion of the primary system directly to secondary customers, that's a concept we're going to discuss in just a minute. And if not, whether they should have engaged in this workshop process. But before we get into those issues, I'd like to take a step back and drill down just for a minute into some of the technical concepts here. I think that would be very helpful. First of all, what's the difference between the primary system and the secondary system? Think about the poles in your backyard. And conveniently, I think there's a good example just outside of the courtroom here, but those poles, let's ignore all the cable stuff, the TV stuff, the phone stuff. They have two sets of electrical wires on them generally. There's one set that runs across the top of the TV. That's the primary system. There's another set you'll find about two-thirds of the way up. That's the secondary system. Primary top, secondary below. The second concept you need to understand is the difference between single-phase service and three-phase service. Maybe you already do. But for purposes of our discussion, let's just say that the number of phases is equal to the number of wires that you see. One wire on top, single-phase primary service. Three wires on top, three-phase primary service. Also you need to understand, and Mr. Robertson emphasized this, that while there are exceptions to the rule, and those exceptions are important, the rule is that the smaller guys, residential and small commercial customers, usually use single-phase service, and the big guys, the commercial and industrials, generally use three-phase service. So with that technical background, I'd like to walk you through an example that highlights what we're talking about here. Let's say we have a substation, and the substation is where really high voltage electricity is stepped down to a level that's closer to something you and I can use. Electricity almost always leaves a substation as three-phase primary, three wires coming out of it. Let's say that those three wires run north to a certain point, okay? And at that point, to the east, we have a group of commercial and industrial customers, the big guys. Those guys need three-phase service, so from that point, we run three-phase primary out to server. Let's say to the west of that point, though, there are three different city blocks. And like typical city blocks, it's a mixture of residential homes and probably bakeries, let's say, small commercial customers. Now, those guys don't need three-phase service, so what we're going to do is run one primary line to each of those three city blocks. So at the end of the day, we have one three-phase line going east and three single-phase lines going to the west. Now, with that serving as our baseline, let's take a step back and let's look at how the ICC ordered AIC to recover these costs. What did they approve and why? Well, as it has for many, many years, the ICC approved a method that takes all of the costs, all of the costs running out of our substation here, and cuts those up based upon demands of the end-use classes. And that's fair, the rationale being that if you as a class use more, you're going to pay more of the costs of this whole system. That's also fair because it recognizes the complexity of what's going on here. And it's based upon things we know. We know the total cost of the system and the respective demands of each of the classes, the big guys, the residential class, the small commercials. But you don't break that up into kilowatts. We do not. We do not. And that would, to me, would be even to everybody on the number of kilowatt usage. Well, it's not necessarily because of the number. If you use more kilowatts, the thought is that you're imposing more demands on the system, and you should pay more of those costs. But you're saying no, you shouldn't. I'm saying that's the way to do it. It's kind of a function of how you cut up the total cost. We take all of those costs, lump them together, and then cut them up based upon who's using the most. What I see what happens, too, is look at the different types of facilities. Try and allocate the costs of just the three-phase wires and just the cost of the primary. We don't draw that line today. We lump everything together, cut them up based upon the demands of the end users. And what you just described regarding distribution is not unique to Ameren. It is not. Commonwealth, Ameren. It's the industry. No, that's just the concept of electrical distribution. It's not unique at all. Another reason that the currently approved methodology is fair is that because all of the costs of what's going on here, it's not what the ICC described as neatly and fairly segregable. And that's fair because the courts have found that those costs don't need to be segregated into this example that tries to parse them into what phase of service serves who. I can't find a decision that could be more on point than the REACT decision here. That's a sister utility from the state, second district. It's the exact same topics that are before this court. And that court held that the Public Utilities Act does not mandate that costs associated with the precise facility be recovered only from customers that use that facility. They really pushed back on the notion of a granular itemization of costs. They said that's not necessary. So what does IIC want us to do here? Let's look back at our examples. They're saying that because those commercial and industrial customers in the east aren't using part of that system that's serving those three city blocks, that those big customers shouldn't have to pay for all of that. The folks in the city blocks should eat some of those costs. So what's the problem with that? First of all, as the second district said, that that's not necessary. Again, they really pushed back on this notion of granular itemization, said we don't have to do it. Second problem is that this 10% to 20% that you hear is somewhat plucked out of the air, in my opinion. We're not sure why IEC picked that range, why it wasn't 0% to 10% or 20% to 30%, for example. And the analysis that would have been needed to implement that recommendation, this exercise where we try and determine the demand by class here, that's not in the record. No one had done that. Those facts don't exist. Most importantly, in my opinion anyway, this recommendation is lopsided. IIEC makes much to do about the facilities serving those three city blocks, but no one says anything about the facilities that are serving our commercial and industrial customers here in the east. No consideration is given to the fact that maybe those three city blocks aren't using those three phase lines going to serve our commercial and industrial customers there. You heard it this morning, there's much emphasis on this 54%. Lastly, what about the 46? No one says anything about the 46. I don't think the 46 should be ignored. Finally, this whole issue, and you may have to take my word for it here, is much more complex than my example. In reality, we probably have some residential folks and small commercial folks out here in the east around our manufacturing hub. And in reality, we may have a manufacturer over here in one of our three city blocks. Well, they don't get the three phase. You don't have three phase over there. In my example, no. Only in certain areas you have three phase. Right. That's part of the issue here is that there are exceptions to all of these rules. Sometimes there can be a commercial and industrial customer that takes single phase service. And sometimes, I think especially out in the country, we can run three phase service to serve residential folks. I didn't know you ran three phase in the country. Sometimes. Yeah, sometimes. Sometimes it's a more efficient way to transmit electricity. I thought that was based on voltage, not three phase. It kind of depends. You increase the voltage so that you can transport it over. Exactly. Exactly, and that's what I kind of got here. And perhaps it's a more rural area. Sometimes three phase is used to get to residential hubs because it's more efficient to cover longer distances. So, again, there are all these exceptions. So you're taking it off. One phase is all that you're taking off for single phase. One line, yeah. Sometimes there are three lines that serve residential. That's the exception to the rule. I'm just trying to say sometimes it's not as simple as, you know, one line always goes to res, three lines always go to commercial and industrials. But if you want three phase, you've got to have three lines. Exactly. I thought you had four, but you only have to have, what do you call it about the ground? You don't count that. I don't think we count the ground. But, again, there's two phase, there's dual phase. There are exceptions to all these rules. We have tens of thousands of miles of distribution lines. I didn't know there was a dual phase. There's two. There is two. I can't give you a good example of where that's used, but I know that it exists. I think it's pretty rare. But there is a dual phase. What would they use that for? I don't know. I don't know. So that said, it's very complex. And the ICC, I think, rightfully relied upon that complexity. I have just a few minutes. Let's transition to the workshop question. If this is so hard, why not study it more? Why not just have the workshop? Two reasons. It's not only the complexity of the system, but the fact that it's constantly changing. We're building things, moving things, taking down lines, adding new types of services. And the ICC relied upon that fact. This would not have been a static investigation. It probably would have had to have been performed time and time again. Second is this, the ComEd decision here. ComEd was in for their rate redesign case the same time we were. They were just a little bit ahead of us. And the AIC witness, Amarant's witness, testified that ICC, if you're going to make the utilities do this, if we're going to do this, you should do it for both utilities. But the recommendation in the record in this case was if you're not going to make ComEd do it, though, we don't think we should do it as a stand-alone utility, and that's what happened here. Now, I will admit that if the ICC went in to ComEd's record and cherry-picked facts out of that record and used it to support their conclusion in this case, that would have been problematic. But that's not what happened here. The only fact that the ICC relied upon was the fact that the two decisions were the same. And I think consistency in that regard is very good. I see I'm about out of time, but in conclusion, the commission's decision on the primary distribution topics are lawful, they're reasonable, and they are supported by the record in this case. I ask that they be affirmed. We'll see the remainder of my time. So, Mr. Stanton, unless you have questions. Thank you. I know it's quite unfair. I'll ask you the question. But I see the REACT case as an appellate case, right? That's correct, yes. Now, and what district's that from? That's from the Second Judicial District. And that's not precedent in our district, is it? Well, there's one appellate court. So, generally, you would want to be consistent. I thought it's not starting in CISIS. Yes. That's correct. But generally speaking, the different districts will follow the other districts' case. If it was L.I. Supreme, it would be different. Yes. Okay. Counsel, let me ask you a question, too, to make sure it gets covered. Why are grain dryers given, I won't say special, a different treatment? And does that, then, cause a problem for the entire, make sure I get the terminology right, the moderation? No, no. Why were they given special treatment? They're given special treatment because they have a different usage profile. They're not, the grain, the rate limit or provision does not apply to all DS-4 customers. It applies only to a narrow usage profile. It applies to DS-3 and DS-4 customers that consume 20% or less of their annual electricity during the summer months. And that's grain dryers and that's grain elevators. So, different conditions apply. So, with respect to the rate limit, it's for that usage profile. Those are the customers who are eligible for the rate limit or profile, not large, big industrial companies who use the electricity throughout the year. So, that's the difference. That's a big difference. The other difference is that the rate limit phase-out proposal was part of a negotiating compromise proposal in connection with the introduction of a new delivery service class, the DS-6 class. And it's an optional DS-6 temperature sensitive tariff that creates seasonally differentiated rates. And the uncontested evidence showed that that DS-6 tariff would provide system reliability benefits for admin because if you can curtail usage during those peak demand months, you can increase the reliability of the system and ultimately, long-term, perhaps, reduce the investment cost. That would redound not only benefits to admin but also to all customer classes through lower rates. And that the gradual elimination of that rate limit provision would send a meaningful price signal to the customers that are in that DS-3 and DS-4 class with, again, that smaller usage profile, that different usage profile where they don't use as much electricity in the summer months. It would send a signal to them to take service out of this new DS-6 tariff. So, those are two big differences between the large industrial customers in the primary high voltage and the plus 100 kilovolt class different between the rate limit provision. So, the other differences are with respect to the rate limit provision itself, that provision is going to be completely eliminated in three years. So, one-third, one-third, one-third and that provision is going to be eliminated. With the EDT subsidy, it's expected that it will be eliminated within five years but an assumption of the model is that there's no additional cost. And it will incur no additional costs, an increase in costs, and there will be no additional rate increases. So, to the extent that there are, the EDT subsidy phase-out could go beyond the five years. It could go beyond if the commission had adopted the ten-year phase-out. It could be 11, 12. So, you know, those are important differences. Also, with the rate limit provision, the subsidy was, stayed within the class. So, the DS-3, other members of the DS-3 class paid that subsidy to the grain dryers. And the grain dryers in the DS-4 class, other customers within that DS-4 class paid that subsidy. Whereas, with the EDT subsidy, what you have is, you have the DS-4 residential, DS-2 small commercials, DS-3 commercials. Those inter-class subsidies, so they're the ones paying the subsidy to these large industrial customers as well as different customers within the DS-4 class are also the primary, the high-voltage. There's a table in the commission's order, page 61. The high-voltage is just for the transmission. And actually, when it goes through a transformer, doesn't it, when it gets to any, say, grain dryer, so they're not using high-voltage. They're just using a three-phase. Is that not correct? What's their voltage, usually? It's plus 100 kilovolts. They're taking the voltage at plus 100 kilovolts. I don't know. I'm not sure that there's a phase. So, I mean, they're breaking it down before it gets into the user or transformer. They may have their own equipment. So, they're taking it at supply voltage. They may have their own equipment. I think it may be the distinction that you're talking about. It's not stepped down through a transformation charge. They're charged at the higher, I think, the charge at that higher supply voltage rather than broken down to a small voltage. Because I was having trouble with your 600 volts. In the brief, everything was 600 volts. Oh. So, another point on the discrimination argument, IEC claims in its reply brief that the commission found that rate increases of 50% to 100% for grain dryers constitute a rate shock that needed mitigation. But the commission made no specific finding with respect to any particular increased percentage that constituted rate increases for the grain dryers. Rather, the commission found that that three-year rate limiter provision phase-out was reasonable in connection with the proposal, connection with the benefits that would incur both to American and hopefully to the other rate appliances. So, with respect to the discrimination claim, first you have to look at that different customer profile. Does it apply to all DS4 customers? That's one reason why it's different. It applies to that. These grain dryers use less than 20%, 20% or less, of their electricity during the summer months. It doesn't apply to all DS4 customers. And the second is in the context of this negotiated compromise proposal. And it's not a point on a line that's reasonable. It's a continuum. It could be, you know, there's a range of reasons. It could be a number of things. You know, the commission could have reached a different decision if they hadn't showed something different based on that compromise proposal. So that's the discrimination argument. They also claim that the 91% to 117% increases are per se unjust and reasonable in violation of Section 9-1-1 of the Public Utilities Act. But there's nothing in the statute or commission rule or commission order that limits increases in these rate design cases to some arbitrary percentage number. Just and reasonable rate is a question of fact. It's committed to the commission's sound judgment, and it's not the product of legal formula. So that's why rate design, because of its complexity and the need to apply informed judgment, is uniquely a matter in the commission's discretion. That's for good reason, because looking at percentage increases without context or perspective can be misleading. And so these 117 and 91% viewed in isolation, they might seem high, but the uncontested evidence showed that the total bill impact on these customers is minor. In fact, specifically, the recovery rates are so low for these DS4 plus 100 kilovolt customers that a 114% increase to the delivery service rates yields only about a 1.25% increase in the total bill. It's just a little over 1%. So the commission has recognized the importance of looking at rate mitigation from the perspective of the total bill, and it's eminently reasonable. You might have a large percentage increase in one component, and that one component might represent only a small percentage of the total bill, and that's the case here. Relatively small impact. The evidence showed 114% is about 1.25% of the total bill. And there's testimony in the record that these larger industrial customers, the DS4 plus 100 subclass, that they can shoulder larger EDT percentage increases than would otherwise be allowed under IAC's proposal, which would eliminate the subsidy in their modified proposal, limiting somebody's total limit in about 10 years. Just one last issue. They argue that the commission's decision represents a significant- Counsel, you're out of time. Thank you very much. Mr. Roberts in rebuttal. I guess the first point in rebuttal is if Amron had put on the kind of evidence that they, in the case, for consideration and presented a witness who made all the statements that were made in oral argument here today and given us a chance to cross-examine them about it, that would have been great. But the problem is Amron said little or anything about the complexity of its system compared to ComEd or the differences in its system compared to ComEd, and I think all you have to do is drive to Chicago. ComEd's problem was they served a huge urban area with a lot of hotels and apartment buildings and condos and all the other things that are up there, and it would have been a big task for them to perform the kind of study that we're talking about. And I think that's what the REACT Court was largely focused on, and that was based on the evidence that ComEd had presented. But there's no evidence like that here in this case. There's just not. And all we're saying is we should at least have been given the opportunity, and that's why we're asking you to remand the case, to address the issue. If Amron's got something to say about the complexity of their system, let him say it in remand. In addition, this idea that was just raised by the Commission's counsel of total bill is based on a statement that was made by an Amron witness in his certificate of testimony, and I think it was Mr. Jones who suggested that the Commission had decided that it was appropriate to consider the total bill when determining rate shock. And by total bill, I mean a lot of these customers buy their electricity from the third party. They buy their delivery service from Amron. They don't buy electricity from Amron. They get a bill from these other parties for their electricity. And what the Commission apparently wants to say is we determine rate shock not by what the utility charges you for the service that they provide, but the service and products that are provided by a third party that have nothing to do with this case. In addition, the record shows that that same Amron witness agreed with our witness that his statement and his reliance on a prior Commission order for this billing situation was taken out of context and that the Commission had not really said that it was appropriate to consider the total bill. In that particular case, the Commission was dealing with a situation with whether or not the electric distribution tax and the impact of collecting that tax in a new manner on a cents per kWh basis should be reflected in the bill that Amron was, the delivery service bill, and in the evaluation of whether rate shock existed. And the Commission said, look, the delivery service tax is a cost that you have and that you collect from customers. It's part of your cost of providing service. Yes, it's appropriate to include the impact of that tax in considering the impact of the increase here, but not the services and products that are provided by a third party that isn't Amron. Also, the system is constantly changing. I've been doing this for 40 years. I've been in a zillion rate cases. The utility comes in all the time. They ask for increases in their rate base. What are those increases? New buyers, new transformers, transmission. We had a case in front of you here not too long ago about Amron's new transmission line that's going across the middle of Illinois. They are changing their system all the time. They still do cost studies. They presented a cost study of this piece that tried to show what the cost responsibility for each customer class was in relation to the Amron system. Those studies change all the time. The idea that because their system is changing they couldn't possibly do this study flies directly in the face of the fact that they do do studies in every case where they ask for a rate increase or in these rate design cases so the commission can see what each class is cost responsible for. To me, that's not really a very good argument for rejecting our position. Let me thank all three of you for your well-written briefs in this case. It was helpful in explaining terminology that we don't deal with on a daily basis and I learned something from each of your briefs as I read through them. They were well-written and thank you for that. We'll take this case under advisement and issue a ruling in due course.